## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

Brian Duffy as limited legal
guardian for Caleb Duffy,

Case No.

Plaintiff,

vs.

**Complaint**

**Jury Trial Demanded**

Heidi Brown, Mai Cha, Lisa Deneve, Nicholas
Erickson, Robert Hansen, Michael Johnson,
Lucio Marquez-Zazueta, Thomas Mensing,
Virginia Olson, Tim Parker, Winona Pavilla,
Amanda Reiman, and Tsha Vang, all in their
individual capacity, Advanced Correctional
Healthcare, Inc., and Dakota County

Defendants.

For his Complaint, Plaintiff Brian Duffy ("Plaintiff"), as limited legal guardian for

Caleb Duffy ("Duffy"), by and through his attorneys, states and alleges upon knowledge,

information, and belief formed after an inquiry reasonable under the circumstances, as

follows:

### Introduction

1.      Duffy experienced deplorable conditions inside a padded cell at the Dakota

County Jail when the obvious and severe symptoms he displayed of a medical emergency

were repeatedly ignored.  He languished in his cell in a psychotic state with no clothes,

rolling around in feces, blood, urine, and vomit for hours on end.  His pleas for help were

ignored until it was almost too late, and he was finally taken to an emergency room

where he was diagnosed with diabetic ketoacidosis with coma.

2.      This is an action for money damages brought pursuant to 42 U.S.C. § 1983 for the injuries Duffy suffered as the direct and proximate result of the Defendants' deliberate indifference to Duffy's serious medical needs and their negligence, as set forth herein.

**Parties**

3.      Plaintiff is Duffy's natural parent and court-appointed limited legal guardian with the power to make medical decisions and commence legal actions on behalf of Duffy under Minnesota state law.  Plaintiff is a citizen of the United States and a resident of the State of Minnesota.

4.      Duffy is Plaintiff's adult son.  At all relevant times to this action, Duffy was twenty-two years old, a citizen of the United States and a resident of the State of Minnesota.

5.      Defendant Dakota County ("the County") is a county within and a political subdivision of the State of Minnesota.  It is a body politic and corporation subject to suit pursuant to Minn. Stat. § 373.01 *et seq.*  The County is also defined as a municipality for purposes of tort liability pursuant to Minn. Stat. § 466.01 *et seq.*  The County owns and operates the Dakota County Jail (the "Jail").

6.      The County employs deputy correction officers and staff at the Jail.

7.      All acts and omissions of Jail corrections personnel identified herein are the acts and omissions of the County.

8.     At all relevant times, the County owed Duffy and other detainees/inmates at the Jail a nondelegable duty of care to ensure that they received legally sufficient healthcare.

9.     Advanced Correctional Healthcare, Inc. ("ACH") is a private corporation with a principal place of business in Tennessee that is licensed to and does business in the State of Minnesota.

10.     The County contracted with ACH to fulfill the County's constitutionally required healthcare obligations to inmates and detainees at the Jail.

11.     ACH employs medical personnel and provides the services of those personnel to the Jail for the purposes of providing healthcare to the Jail detainees.

12.     All acts and omissions of jail medical staff and ACH personnel are the acts and omissions of both ACH and the County.

13.     Employees of the County and ACH both work under color of state law for purposes of 42 U.S.C. § 1983.

14.     Nurse Practitioner Heidi Brown ("NP Brown") is a nurse practitioner who was the medical provider for the Jail and was employed by ACH and acted under color of state law.  She is a citizen of the United States and a resident of the State of Minnesota.  She is sued in her individual capacity.

15.     Deputy Mai Cha was a deputy in the Jail, employed by the County, and acted under color of state law.  She is a citizen of the United States and a resident of the State of Minnesota.  She is sued in her individual capacity.

3

16. Deputy Lisa Deneve was a deputy in the Jail, employed by the County, and acted under color of state law. She is a citizen of the United States and a resident of the State of Minnesota. She is sued in her individual capacity.

17. Deputy Nicholas Erickson was a deputy in the Jail, employed by the County, and acted under color of state law. He is a citizen of the United States and a resident of the State of Minnesota. He is sued in his individual capacity.

18. Deputy Robert Hansen was a deputy in the Jail, employed by the County, and acted under color of state law. He is a citizen of the United States and a resident of the State of Minnesota. He is sued in his individual capacity.

19. Deputy Michael Johnson was a deputy in the Jail, employed by the County, and acted under color of state law. He is a citizen of the United States and a resident of the State of Minnesota. He is sued in his individual capacity.

20. Deputy Lucio Marquez-Zazueta was a deputy in the Jail, employed by the County, and acted under color of state law. He is a citizen of the United States and a resident of the State of Minnesota. He is sued in his individual capacity.

21. Deputy Thomas Mensing was a deputy in the Jail, employed by the County, and acted under color of state law. He is a citizen of the United States and a resident of the State of Minnesota. He is sued in his individual capacity.

22. Nurse Virginia Olson ("Nurse Olson") was employed by ACH and acted under color of state law. She is a citizen of the United States and a resident of the State of Minnesota. She is sued in her individual capacity.

23.     Corporal Tim Parker was a Corporal in the Jail, employed by the County, and acted under color of state law.  He is a citizen of the United States and a resident of the State of Minnesota.  He is sued in his individual capacity.

24.     Deputy Winona Pavilla was a deputy in the Jail, employed by the County, and acted under color of state law.  She is a citizen of the United States and a resident of the State of Minnesota.  She is sued in her individual capacity.

25.     Nurse Amanda Reiman ("Nurse Reiman") was employed by ACH and acted under color of state law.  She is a citizen of the United States and a resident of the State of Minnesota.  She is sued in her individual capacity.

26.     Deputy Tsha Vang was a deputy in the Jail, employed by the County, and acted under color of state law.  She is a citizen of the United States and a resident of the State of Minnesota.  She is sued in her individual capacity.

**Jurisdiction and Venue**

27.     Plaintiff brings this action pursuant to 42 U.S.C. §§ 1983 and 1988, the Eighth and Fourteenth Amendments to the United States Constitution, and 28 U.S.C. §§ 1331 and 1343(a)(3).  The aforementioned statutory and constitutional provisions confer original jurisdiction over this action.  This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

28.     Venue is proper in this Court under 28 U.S.C. §1391(b) because all incidents, events, and occurrences giving rise to this action occurred in the District of Minnesota. Moreover, all of the parties reside in this Judicial District.

**Background**

**A.    Overview of relevant medical concepts.**

29.    Diabetes is a disease that affects how the body uses blood sugar (glucose).

30.    Type 1 diabetes is a chronic condition that cannot be prevented.

31.    Diabetes can lead to excess sugar in the blood, which can lead to serious health problems.

32.    A normal fasting blood sugar reading is 70-100 mg/dl and under 140 mg/dl two hours after eating.

33.    Diabetics often have a slightly higher target blood sugar of around 150 mg/dl.

34.    Generally, if an individual has a blood sugar reading of 300 mg/dl on two successive blood sugar checks, they should get emergency care.

35.    Generally, if an individual has a blood sugar reading above 400 mg/dl, they should go to the emergency room.

36.    Diabetes is generally treated with long-acting (basal) insulin or short-acting insulin, or both.

37.    Basal insulin (sometimes called background insulin) works for 24 hours or longer and is generally taken once a day at the same time.

38.    Short-acting insulin is generally taken before meals to help the body process carbohydrates from food.

39.    The dosage of short-acting insulin depends on an individual's target blood sugar, how many carbohydrates the individual is eating, and how active they are.

40.     Sliding scale insulin is a technique used to determine the pre-meal or nighttime short-term insulin dosage based on a pre-defined blood glucose range.  Sliding scale insulin does not account for changes to blood sugar from snacks, stress, or activity.

41.     Diabetic ketoacidosis is a serious complication of diabetes.

42.     Diabetic ketoacidosis develops when the body cannot produce enough insulin, which allows the body to use sugar for energy.

43.     Without being able to use enough sugar for energy, the body begins to break down fat to use as energy and sugar builds up in the blood.

44.     The breakdown of fat for fuel causes acids to build up in the bloodstream.

45.     The buildup of acids in the bloodstream are called ketones.

46.     Diabetic ketoacidosis symptoms include the following: extreme thirst, frequent urination, nausea, stomach pain, fatigue, shortness of breath, fruity-scented breath, confusion, and loss of consciousness.

47.     Untreated diabetic ketoacidosis can lead to coma or death.

48.     In addition to when they have high blood sugar levels, generally, individuals should get emergency care if they have numerous symptoms of diabetic ketoacidosis.

49.     Diabetic ketoacidosis symptoms can develop quickly.

50.     Gabapentin is an anti-convulsant medication that is used off-label to treat anxiety.

51.    Sudden discontinuation of Gabapentin can cause withdrawal symptoms of anxiety, pain, sweating, agitation, disorientation, confusion, combativeness, hallucinations, and paranoid delusions.

52.    Gabapentin withdrawal symptoms can appear in 12 hours.

**B.    Duffy's history of serious medical and mental health needs.**

53.    On August 9, 2018, Plaintiff was appointed a limited guardianship over Duffy due to Duffy's "inability to meet [Duffy's] needs for medical care, nutrition, safety and shelter." The Court noted Duffy's "executive functioning skills are impaired . . . and he cannot independently manage his medical care[.]"

54.    Plaintiff's limited legal guardianship over Duffy has continued to this day.

55.    Prior to the subject incident, Duffy had been diagnosed with Bipolar I Disorder, Autism Spectrum Disorder, Generalized Anxiety Disorder, Major Depressive Disorder, ADHD, and Type I Diabetes.

56.    Duffy had been hospitalized multiple times in the 18 months prior to his confinement at the Dakota County Jail for diabetic ketoacidosis and mental health crisis intervention.

57.    Duffy was civilly committed on January 19, 2021. That commitment was continued on July 15, 2021.

58.    Prior to his confinement in the Jail, Duffy was taking 600 mg of Gabapentin three times a day for anxiety.

59.     Prior to his confinement in the Jail, Duffy was taking Tresiba, a long-acting insulin used as a basal dose, and Novolog, a fast-acting insulin as needed based on blood sugar checks and carbohydrate intake.

**C.      Duffy was arrested on July 4, 2022, and threatened suicide, information that was provided to the Jail's staff.**

60.      On July 4, 2022, sometime shortly after 6:30 p.m., Hastings Police took Duffy into custody on probable cause for domestic assault.

61.     When the Hastings Police delivered Duffy to the Dakota County Jail, Duffy told the arresting officer to "put a bullet in his head."  The arresting officer informed Jail staff of Duffy's comment and specifically noted it in his report, though this was not noted in the Jail intake paperwork.

**D.      Plaintiff contacted the Jail numerous times throughout July 4th, identifying Duffy's serious medical needs and need for immediate medication and hospitalization.**

62.     Starting before 9:00 p.m. and over the course of several hours, Plaintiff called the Jail repeatedly to inform the staff that his son, Duffy, was a vulnerable adult, mentally ill, needed to be hospitalized, and needed to take his medication, namely Gabapentin. Plaintiff informed the Jail staff that he was Duffy's legal guardian for medical decisions and that Duffy could become psychotic if he does not get that medication.

63.     Plaintiff also informed the Jail staff at this time that Duffy is a Type 1 diabetic and needed insulin.

64.     Despite Plaintiff's numerous calls, the Jail staff took no action to get Duffy his needed insulin or question him about his diabetes, hospitalizations, or other medications, and claim to have been unaware of his diabetic status until 5:30 a.m. on July 5th.

**E.     Duffy's early interaction with Jail staff on July 5th demonstrated he was suffering from high blood sugar and erratic behavior.**

65.     At around 5:35 a.m. on July 5, 2022, Deputy Pavilla observed Duffy pacing in the holding cell and yelling that he was dying.  Duffy informed Pavilla that he had diabetes and needed his blood sugar checked.

66.     Deputy Pavilla checked Duffy's blood sugar and found it to be 531 mg/dl, which is dangerously high and generally requires an emergency room visit and hospitalization.

67.     Nurse Olson arrived at 6:10 a.m. and the Jail staff contacted her to assess Duffy.

68.     Nurse Olson documented a plan for treatment as follows: "BS check QID, Sliding scale insulin with meals, Novolin NPH insulin, 12 Units SC Q AM."  This means to check blood sugar four times per day and give Duffy sliding scale insulin with meals depending on his blood sugar check, and that Duffy should get 12 units of an intermediate-acting insulin as a basal dose every morning through subcutaneous injection.

69.     The sliding scale order for Duffy called for the following amounts of Novolin R insulin depending on his blood sugar levels: 201-250 blood sugar: 4 units;

251-300: 6 units, 301-350: 8 units; 351-400: 10 units, 401-450: 12 units; ">450: Call Medical Provider."

70.     Nurse Olson administered Duffy 14 units of fast-acting insulin per the sliding scale order.

**F.     Defendants denied Duffy his prescribed medication.**

71.     At around 8:10 a.m. on the morning of July 5, 2022, Nurse Reiman met with Duffy and was informed that Plaintiff was Duffy's guardian.  Duffy gave Nurse Reiman Plaintiff's cell phone number and advised that Plaintiff had all of Duffy's medical history information.

72.     The Jail corrections and medical staff knew of Duffy's prescribed medication (including Gabapentin and insulin) based on conversations with Plaintiff and Duffy by 8:15 a.m. on July 5, 2022.

73.     Plaintiff brought Duffy's insulin medication and Gabapentin to the Jail at around 10:44 a.m.  Thus, the Jail had Duffy's Gabapentin and insulin medication in its possession by 11:00 a.m. on July 5, 2022.

74.     The Gabapentin and insulin medication the Jail possessed for Duffy was in its original packaging with appropriate prescriptions on the bottles, as required by the Jail and ACH.

75.     By 11:00 a.m. on July 5, 2022, Duffy would have already been without any Gabapentin for a minimum of 16 hours, which is long enough for him to go into withdrawal.

11

76. Despite seeing obvious and troubling signs of withdrawal and psychotic behavior, including sweating, agitation, disorientation, combativeness, and confusion, throughout Duffy's jail stay, and with knowledge of Gabapentin withdrawal hazards, and, further, without giving Duffy an in-person evaluation by NP Brown, the Jail medical staff, including NP Brown and Nurses Olson and Reiman, never administered Gabapentin to or initiated a withdrawal protocol for Duffy, demonstrating deliberate indifference to Duffy's serious medical needs and medical negligence.

77. Duffy's psychotic behavior, including agitation, disorientation, combativeness, and confusion were caused in part by the Jail medical staff's, including NP Brown's and Nurses Olson and Reiman's, failure to administer his prescribed gabapentin or initiate a withdrawal protocol.

**G.   Duffy's erratic behavior led to him being put on suicide watch and placed in a padded cell.**

78. Just before noon on July 5, 2022, Duffy had a blood sugar reading of 204 mg/dl, which was high enough to require 4 units of fast-acting insulin per the sliding scale order.

79. At that time, Nurse Olson attempted to provide Duffy with his sliding scale insulin, but Duffy refused.

80. Nurse Olson reported that Duffy acknowledged understanding the ramifications of refusing his insulin, and then he "sat down and started slamming the back of his head against the cement and said, "I'll just hit my head until I die."

12

81.     Nurse Olson told deputies to place Duffy in a padded cell and on suicide watch.

82.     Despite Duffy clearly demonstrating an inability to care for himself or understand the consequences of his decision to not take his medication, Nurse Olson and Jail medical staff relied on Duffy's supposed acknowledgement that he understood the ramifications of his refusal to take insulin and did nothing further to ensure Duffy took his sliding scale insulin.

83.     Jail medical staff contacted NP Brown and informed her of Duffy's condition, but she took no new action and still refused to provide him with his prescribed Gabapentin or otherwise ensure he received his insulin.

84.     At approximately 12:31 p.m. on July 5, 2022, Jail corrections staff noted in Duffy's watch log that he refused his meal.  This log entry was categorized as "Watch Diabetic Care Given."

85.     At 12:31, a Jail sergeant noted in the watch log that Duffy was placed on suicide watch and that Duffy "has had 387 [sic] attempts in the past 10 years."

86.     Duffy's refusal of insulin and subsequent refusal to eat his noon meal, in combination with his prior insulin measurements and suicidality, should be viewed as very concerning, but the Jail medical and corrections staff took no action.

**H.      Starting at 3:00 p.m., Duffy stripped naked, repeatedly vomited, and begged for a doctor.**

87.     While on suicide watch, Jail corrections staff were required to perform well-being checks on Duffy at least every 15 minutes.

88. Duffy's cell had padded walls and a padded floor, with a metal grate in the floor.

89. Once in his padded cell, Duffy repeatedly stripped his Kevlar gown off and then put it back on until around 3:00 p.m., after which he took it off again and remained naked.

90. At 2:59 p.m. Deputy Pavilla noted in the watch log that Duffy was "kicking cell door, screaming, had refused to put his hands back into the cell from the pass through."

91. Surveillance video shows that at 3:29 p.m., Duffy vomited in his cell and then stood in the vomit immediately afterward.

92. At 3:30 p.m., Duffy violently rammed his head into the walls of his padded cells multiple times and then held his head in pain and laid down.

93. At about that same time, Deputy Deneve noted in the watch log, "secure in padded cell screaming and yelling: I need a doctor[.]" Deputy Deneve made no effort to get Duffy medical attention.

94. Deputy Pavilla also logged that Duffy was yelling that he "needs a doctor" at 3:30 p.m. and again at 3:49 p.m. Deputy Pavilla made no effort to get Duffy medical attention.

95. Surveillance video shows that between 3:45 and 4:00 p.m., Duffy urinated in the middle of his cell, vomited three times, and then defecated on the floor.

14

96.     At 4:02 p.m., Deputy Deneve saw but ignored the urine, feces, and vomit in the cell and simply noted in the watch log, "naked lying on cell floor screaming and yelling[.]"

97.     Deputy Pavilla made the exact same notation at 4:19 p.m., again seeing and ignoring the conditions in Duffy's cell.

98.     Deputies Deneve and Pavilla's log entries violated ministerial duties contained in the County's Custody Manual, which requires log entries for special management detainees/inmates like Duffy to provide sufficient detail to adequately reflect the events of the day for future reference.

99.     A medical flowsheet note from the Jail identifies Duffy's blood sugar reading at 4:30 p.m. (presumably on July 5th) as "High," meaning it was so high the machine could not measure it.

100.    Any blood sugar reading over 450 required Jail staff to "Call Medical Provider," which should have resulted in a call to NP Brown, though there is no evidence of this occurring.

101.    Nurse Reiman gave Duffy 16 units of his sliding scale insulin during the evening medical pass, which she noted he cooperated with.

102.    Nurse Reiman noted no distress or other concerns with Duffy despite the condition of Duffy and his cell, which had vomit, feces, and urine all over the floor.

103.    At 5:31 p.m., Deputy Pavilla categorized her entry as "watch Diabetic Care Given" and stated Duffy "refused meal."

104. Duffy refused both lunch and dinner, and was a known diabetic with high blood sugar. But nothing was done regarding his lack of food intake.

105. Video surveillance shows Duffy vomited on at least 7 different occasions on his cell floor between 3:00 and 6:00 p.m. At times he appeared to lick back up his own vomit.

106. None of that activity was reported in the 14 welfare checks during this three-hour timeframe by deputies Pavilla and Deneve.

107. By 6:00 p.m. on July 5, 2022, even a layperson with no corrections or medical training would understand that Duffy needed urgent medical attention, but Deputies Pavilla and Deneve, demonstrating deliberate indifference to Duffy's serious medical needs, failed to request emergency assistance, speak to the medical provider, or even request the immediate attention of a nurse.

108. From 6:00 to 9:00 p.m., Duffy lay on the floor mostly naked and vomited twice more as shown in the below photograph.



109. From 7:00 to 10:30 p.m., Captain James Gabriel noted in his log multiple instances of unusual behavior by Duffy, including:

    a. At 7:36 p.m., "sitting on floor talking to himself."

    b. At 7:46 p.m., "rocking back and forth on floor."

    c. At 10:22 p.m., "standing at cell door yelling."

110. But Gabriel failed to note the conditions in Duffy's cell or that he was lying in his own filth.

111. At approximately 10:40 p.m. on July 5, 2022, Jail staff documented a blood sugar reading of 382 mg/dl for Duffy, which required 10 units of sliding scale insulin.

112. Jail staff reported the blood sugar reading of 382 mg/dl to NP Brown, who informed the Jail corrections staff that they did not need to do anything and that the Jail medical staff will follow up with Duffy in the morning.

17

113.    The standard of care required that NP Brown send Duffy for emergency medical care or ensure he had healthcare available for closer monitoring at the Jail.  But NP Brown did nothing and chose to wait for the morning when nurses would be back on site, demonstrating deliberate indifference to Duffy's serious medical needs and medical negligence.

**I.      Between 12:01 and 8:25 a.m. on July 6, 2022, Duffy badly deteriorated and was ignored by the Jail staff demonstrating deliberate indifference to his serious medical needs.**

114.    At approximately 12:46-12:49 a.m., Duffy repeatedly vomited as he sat on the floor of his cell, rocking back and forth.

115.    Duffy vomited at least 10 times between 1:12 and 2:12 a.m., often with repeated bouts of heaves.

116.    As shown by the below photograph, by 2:30 a.m., Duffy's vomit, urine, and feces were all over the floor of his cell.



117.    Between midnight and 2:30 a.m., Deputy Erickson, Corporal Parker, Deputy Johnson, and Deputy Vang each checked on Duffy.  None of them noted Duffy's vomiting or the horrendous condition of his cell, demonstrating deliberate indifference to Duffy's serious medical needs.

118.    From 2:30 to 6:00 a.m. Duffy's condition grew even worse as his actions became more psychotic.

119.    Surveillance video shows that at 3:53 a.m. Duffy urinated in a Styrofoam cup he had received for water, and then drank his urine.

120.    Between 4:40 a.m. and 5:50 a.m., Duffy vomited another seven times, which he then laid directly in.

19

121. At 5:58 a.m., Duffy again urinated in a Styrofoam cup and then drank his own urine.

122. Duffy's psychosis, combined with urinating and vomiting in a cell with only a small central floor drain meant that by 6:00 a.m., his cell and body were covered in vomit and urine, as shown in the below photograph from the jail surveillance video:



123. Between 2:30 and 6:00 a.m., Deputies Vang, Erickson, Johnson, Marquez-Zazueta, and Pavilla all conducted well-being checks on Duffy. But despite Duffy's obvious distress, no corrections guards noted anything out of the ordinary.

124. Multiple deputies did document Duffy's repeated pleas for more water at 4:12, 4:22, 4:55, 5:07, and 5:21 a.m.

125. During this time Duffy not only pleaded for water, he pleaded for a doctor and medical attention.

126. Extreme thirst, frequent urination, nausea and vomiting, lack of appetite, hyperventilation, and confusion are all known signs of diabetic ketoacidosis.

20

127. By 6:00 a.m. even a layperson with no corrections or medical training would understand that Duffy needed urgent medical attention, but Deputies Vang, Erickson, Johnson, Marquez-Zazueta, and Pavilla, demonstrating deliberate indifference to Duffy's serious medical needs, all failed to request emergency assistance, speak to the medical provider, or even request the immediate attention of a nurse.

128. From 6:00 to 8:25 a.m., Duffy's psychosis and physical health worsened as he repeatedly and forcefully slammed his head against the floor and walls, fell down, rolled in his own filth, spread feces on the walls, and exhibited labored breathing.

129. Duffy hit his head on the walls or floor at least 22 different times spread out between 6:00 and 8:25 a.m.

130. At around 8:13 a.m., Duffy slammed the back of his head so hard into the metal grate in his cell that he opened a bleeding wound. Everywhere he laid the back of his head left a blood stain and his chaotic rolling, crawling, and stumbling left feces and blood all over the cell as depicted in the below photograph.



131. During this time, Deputies Hansen, Mensing and Cha all conducted well-being checks on Duffy but failed to take any corrective action, or even note the horrendous condition of his cell, his body, or his bleeding head wound.

132. Duffy was begging for help during this time but instead of noting the obvious emergency in Duffy's cell, deputies only noted the following:

- 06:09   yelling in cell (Dep. Hansen)
- 07:05   hitting cell door (Dep. Mensing)
- 07:27   Yelling in cell (Dep. Mensing)
- 08:02   Yelling in cell, again (Dep. Mensing)
- 08:17   in cell laying on back kicking legs 239 (Dep. Cha)

133. By 8:25 a.m. even a layperson with no corrections or medical training would understand that Duffy needed urgent medical attention, but Deputies Hansen, Mensing, and Cha, demonstrating deliberate indifference to Duffy's serious medical needs, failed to request emergency assistance, speak to the medical provider, or even request the on-duty nurse's immediate attention.

134. The log entries of Deputies Erickson, Johnson, Vang, Marquez-Zazueta, Pavilla, Hansen, Mensing, and Cha and Corporal Parker all violated ministerial duties contained in the County's Custody Manual that required log entries for special management detainees/inmates like Duffy provide sufficient detail to adequately reflect the events of the day for future reference.

22

**J.      Duffy was naked and covered in feces, urine, vomit, and blood when Jail nurses finally checked on his condition, recorded a blood sugar level so high they could not measure it, and decided to send him to the ER.**

135.    Sometime around 8:25 a.m., just prior to Nurse Tingelhoff going to Duffy's cell, a corrections officer told her that Duffy was "not in a good way," and he did not know if she wanted to see him at that time.

136.    Nurse Tingelhoff then went to Duffy's cell and looked at him through the port in the door and documented that Duffy was "rolling around the floor, without a smock on.  Urine, feces and blood was noted on the walls and floor."

137.    Nurse Tingelhoff was unable to take Duffy's blood sugar because he did not come over to the port in the door, though he was able to request his insulin.

138.    Duffy then started hitting his head on the floor. Nurse Tinkelhoff left to get Nurse Reiman.

139.    Nurse Reiman arrived at Duffy's cell at approximately 8:46 a.m.  Nurse Reiman noted "some blood on walls, floor and drain."  Nurse Reiman entered Duffy's cell with two deputies and took Duffy's blood sugar, which was so high the machine could not register it—it just said "HI."

140.    Nurse Reiman left Duffy's cell to call an ambulance, but watched him on video surveillance and saw him repeatedly sit up and fall backwards, hitting his head on the ground, leaving a bloody mark each time, which is depicted in the below photograph from approximately 8:56 a.m.



141.   Nurse Reiman informed the Jail Sergeants that they needed to get into the cell to stop Duffy from continuing to injure himself.  Corrections staff entered Duffy's cell, handcuffed him and put restraints on his legs shortly after the above image was captured.  They finally covered him with a blanket.

142.   At approximately 9:00 a.m., Duffy was carried out of the cell on a sheet.

143.   Duffy was placed in an ambulance at around 9:06 a.m.

144.   Throughout Duffy's ordeal in the Jail, corrections and medical staff, including the individual defendants, talked amongst themselves about Duffy's physical condition, psychotic behavior, and the condition of his cell, giving each of them knowledge of these things even for events that took place either before or after their specific documented interactions with Duffy.

145.   Nurse Reiman did not document her interaction with Duffy, discussions with Plaintiff, or conversations with NP Brown until the afternoon of 7/6/22, twenty-six

24

hours after her first interaction with Duffy and three hours after Duffy had been taken by ambulance to the emergency room.

146.  Similarly, Nurse Olson did not document her July 5, 2022 noon interaction with Duffy and order for suicide watch until the afternoon of July 6, 2022, at 2:53 p.m., approximately twenty-six hours after the interaction and more than five hours after Duffy was taken by ambulance to the emergency room.

147.  The Jail medical records demonstrate a clear effort to document prior interactions with Duffy after his hospitalization; but these documents are both internally inconsistent and inconsistent with other records and simply cannot be relied upon. Moreover, these records still leave significant gaps in treatment and medication administration, thereby violating the standard of care of accurately documenting medication administration.

**K.  Duffy was unresponsive on admission to the Emergency Department and underwent a three-week hospitalization, much of which was in the ICU.**

148.  Duffy presented to the Regions Hospital emergency room with altered mentation, a respiratory rate of 30-50, smelling of ketones (a fruity scent and a clear symptom of diabetic ketoacidosis), a blood sugar reading above 625 mg/dl, and unable to follow commands.  He was a code Red on arrival, meaning he was in critical condition.

149.  The intensive care unit (ICU) staff noted that Duffy was in severe diabetic ketoacidosis with a blood sugar of 1030 mg/dl.  He also had elevated lactic acid levels and had a laceration on the back of his head that needed staples to close.

150. Duffy was severely agitated and kept in four-point restraints, but was pulling hard against them, requiring staff to intubate and sedate him.

151. After intubation, Duffy became hypotensive (had low blood pressure) and had to be given vasopressors (medications that raise blood pressure).

152. Duffy was given a CT scan, which noted a subdural hematoma.

153. Duffy's diagnoses included the following:

- Diabetic ketoacidosis with coma,
- Acute encephalopathy,
- Agitation,
- Subdural hematoma,
- Subdural hygroma, acute, and
- Subarachnoid hemorrhage.

154. Duffy was kept intubated and sedated from July 6 until July 10, 2022. He developed hospital acquired methicillin-sensitive *Staphylococcus aureus* (MSSA) pneumonia.

155. Duffy was put on numerous medications, including Depakote, which caused him to develop hyperammonemia (elevated ammonia in the blood).

156. Duffy was critically ill and stayed in the ICU until July 16, 2022, when he was transferred to inpatient medicine.

157. During his stay in inpatient medicine, doctors attempted to treat Duffy's hyperammonemia and pneumonia, SIRS (a systemic inflammatory response), and persistent fever, among other conditions.

158. Duffy was transferred to the Regions Hospital Psychiatry Unit on July 20, 2022, where he was kept until he was discharged on July 27, 2022.

159.   Duffy's bills at Regions Hospital totaled over $220,000.

**Count I**
**42 U.S.C. § 1983**
**Eighth and/or Fourteenth Amendment Violations**
*Plaintiff v. All Individual Capacity Defendants*

160.   Plaintiff incorporates all allegations in this Complaint as if fully stated herein.

161.   Duffy suffered from serious medical needs.

162.   The Defendants named in this Count owed Duffy a duty to provide for Duffy's medical needs, safety, and general welfare.

163.   The Defendants named in this Count knew that Duffy had serious medical needs that created a high risk of harm if not properly assessed, addressed, and monitored.

164.   The Defendants named in this Count, under color of state law, acted with deliberate indifference to Duffy's serious medical needs in several manners, as detailed herein and as shall be set forth with additional discovery.

165.   Plaintiff alleges in the alternative that each of these Defendants knew that Duffy was suffering from these constitutional violations, had a realistic opportunity to intervene to stop these unconstitutional violations, but failed to intervene either maliciously or with reckless disregard for whether Duffy's rights were violated.

166.   Any healthcare that was provided by Nurse Reiman, Nurse Olson, or NP Brown so substantially deviated from professional standards that it amounted to deliberate indifference.

167. As a result, the Defendants named in this Count engaged in conduct that was in violation of the Eighth, and/or Fourteenth Amendments to the United States Constitution.

168. Duffy suffered significant damages, including life-threatening injuries, and required a prolonged hospitalization as a direct and proximate result of the acts and omissions by the Defendants named in this Count.

169. As a direct and proximate result of the acts and omissions by the Defendants named in this Count, Duffy sustained compensatory and special damages as defined under federal common law and in an amount to be determined by jury.

170. Punitive damages are available against the Defendants in this Count and are hereby claimed as a matter of federal common law.

171. Plaintiff is entitled to recovery of his costs, including reasonable attorneys' fees under 42 U.S.C. § 1988.

## Count II
### Professional Negligence
*Plaintiff v. Advanced Correctional Healthcare and Dakota County*

172. Plaintiff incorporates all allegations in this Complaint as if fully stated herein.

173. Nurse Reiman, Nurse Olson and NP Brown and other employees and agents of ACH owed Duffy a duty to provide Duffy with medical treatment that complied with the relevant standard of medical care.

28

174. ACH is liable for the conduct of Nurse Reiman, Nurse Olson and NP Brown and other employees through the doctrines of respondeat superior and/or apparent authority.

175. Dakota County is liable for the conduct of Nurse Reiman, Nurse Olson, NP Brown, and other ACH employees because it has a nondelegable duty to provide healthcare to its detainees.

176. Nurse Reiman, Nurse Olson, and NP Brown knew or should have known that Duffy needed his prescribed Gabapentin medication or some type of withdrawal protocol but failed to provide him with either.

177. Nurse Reiman, Nurse Olson and NP Brown knew or should have known that Duffy needed immediate medical attention and/or mental health intervention, given his known medical conditions, actions, repeated requests for a doctor, and the physical condition in his cell.

178. Nurse Reiman, Nurse Olson, NP Brown, and other ACH employees deviated from the professional standards of care with respect to Duffy, as detailed herein and as shall be set forth with additional discovery.

179. Plaintiff has supplied a declaration of expert review pursuant to Minnesota Statute § 145.682, subd. 3.

180. These wrongful acts and omissions directly and proximately caused Duffy significant injuries, resulting in compensatory and special damages in an amount to be determined by a jury.

29

181.   Plaintiff hereby claims punitive damages under Minn. Stat. § 549.20 as defendants showed a deliberate disregard for Duffy's rights and safety.

**Count III**
**Ordinary Negligence**
*Plaintiff v. Dakota County*

182.   Plaintiff incorporates all allegations in this Complaint as if fully stated herein.

183.   The individual Defendants and other employees and agents of Dakota County owed Duffy a duty to provide for Duffy's well-being and safety in accordance with the requisite ordinary and professional standards of care.

184.   The individual Defendants and other employees and agents of Dakota County knew or should have known that Duffy needed immediate medical attention and/or mental health intervention, given his known medical conditions and actions as well as the physical condition in his cell.

185.   The individual Defendants and other employees and agents of Dakota County deviated from the requisite ordinary standards of care with respect to Duffy, as detailed herein and as shall be set forth with additional discovery.

186.   Dakota County is directly liable for its operational failures as set forth herein.

187.   Dakota County is vicariously liable for the individual acts and omissions identified herein, including the breach of ministerial duties, as those individuals were acting within the course and scope of their duties as Dakota County employees.

30

188.    Dakota County employees failed numerous ministerial duties, including: failing to recognize Duffy's mental health and diabetic crises; failing to alert medical staff of Duffy's deteriorating condition overnight and in the early morning hours of July 6, 2022; failing to request emergent medical attention for Duffy given his deteriorating condition; failing to accurately note Duffy's condition on well-being/suicide watch logs; failing to restrain Duffy from hurting himself in the padded cell; and failing to recognize Duffy's need for emergent hospitalization until he was nearly comatose.

189.    These wrongful acts and omissions directly and proximately caused Duffy significant injuries, resulting in compensatory and special damages in an amount to be determined by a jury.

190.    Plaintiff hereby claims punitive damages under Minn. Stat. § 549.20 as Dakota County employees and agents showed a deliberate disregard for Duffy's rights and safety.

**Plaintiff demands a trial by jury for issues of fact herein.**

<u>**Prayer for Relief**</u>

WHEREFORE, Plaintiff Brian Duffy, as limited legal guardian of Caleb Duffy, prays for judgment against Defendants as follows:

1.    As to Count I, a money judgment against the individual defendants for compensatory, special, and punitive damages in an amount to be determined by a jury, together with costs and disbursements, including reasonable attorneys' fees, under 42 U.S.C. § 1988 and prejudgment interest.

2.      As to Count II, a money judgment against Dakota County and Advanced Correctional Healthcare for special, compensatory, and punitive damages in an amount to be determined by a jury, in addition to costs, disbursements, and prejudgment interest.

3.      As to Count III, a money judgment against Dakota County for special, compensatory, and punitive damages in an amount to be determined by a jury, in addition to costs, disbursements, and prejudgment interest.

4.      For such other and further relief as this Court deems just and equitable.


**STORMS DWORAK LLC**


Dated: July 18, 2024                    /s/ Ryan O. Vettleson
                                        Jeffrey S. Storms, #387240
                                        Paul C. Dworak, #391070
                                        Ryan O. Vettleson, #312915
                                        222 South 9th Street, Suite 470
                                        Minneapolis, MN 55402
                                        Phone: 612.455.7055
                                        Fax: 612.455.7051
                                        jeff@stormsdworak.com
                                        paul@stormsdworak.com
                                        ryan@stormsdworak.com

                                        and

                                        **BURNS LAW FIRM PLLC**

                                        Patrick R. Burns MN #334054
                                        1624 Harmon Place, Suite 300
                                        Minneapolis, MN 55403
                                        612-877-6400
                                        patrick@burns-law.mn

                                        Attorneys for Plaintiff


32